# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

BRIAN BARRIO,

    Plaintiff,

v.

UNIV. OF MD., BAL. CNTY. ET AL.,

    Defendants.

Civil No. 24-3162-BAH

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION

Brian Barrio ("Plaintiff") brought suit against University of Maryland, Baltimore County

("UMBC"), Board of Regents of the University System of Maryland ("Board of Regents"), and

UMBC President Valerie Sheares Ashby ("Sheares Ashby") (collectively "Defendants") alleging

fraudulent inducement (count I), retaliation in violation of Title IX (count II), promissory

estoppel/detrimental reliance (count III), libel (count IV), and libel by implication (count V). ECF

5 (complaint). Pending before the Court is Defendants' Motion to Dismiss (the "Motion."). ECF

11. Plaintiff filed an opposition, ECF 14, and Defendants filed a reply, ECF 15. All filings include

memoranda of law.[1] The Court has reviewed all relevant filings and finds that no hearing is

necessary. *See* Loc. R. 105.6 (D. Md. 2023). Accordingly, for the reasons stated below,

Defendants' Motion is **GRANTED in part** and **DENIED in part**.

## I.   BACKGROUND

UMBC is a public research university in Catonsville, Maryland and is part of the University

System of Maryland. ECF 5, at 2 ¶ 3. The Board of Regents is the governing body for the

---

[1] The Court references all filings by their respective ECF numbers and page numbers by the ECF-generated page numbers at the top of the page.

University System of Maryland. *Id.* ¶ 4. Sheares Ashby is the President of UMBC.[2] *Id.* ¶ 5. Plaintiff was formerly the Athletic Director at UMBC. *Id.* ¶ 2. Plaintiff's claims stem from his removal from that position in the wake of an investigation into allegations of sexual misconduct and Title IX violations related to Chad Cradock, formerly the head swimming and diving coach at UMBC. *Id.* at 8–13 ¶¶ 24–35.

Plaintiff was recruited by UMBC for its open Athletic Director position in 2019. *Id.* at 3 ¶ 9.[3] Plaintiff was previously the Athletic Director at Central Connecticut State University ("Central") where he "enjoy[ed] significant success in the athletic programs, fundraising and academic areas for which he had responsibility," and his "reputation for excellence was recognized by UMBC, which actively recruited him." *Id.* ¶¶ 8, 9. Plaintiff alleges that he was "selective in considering the opportunities available to him and engaged in a thorough vetting process when it came to the UMBC opportunity." *Id.* ¶ 10.

During the recruitment process, Plaintiff allegedly "engaged in extensive research" of any potential Title IX issues involving UMBC or its staff "so that he could be certain of what he would be stepping into if he decided to accept the Athletic Director position at UMBC." *Id.* at 4 ¶ 11. Specifically, Plaintiff "was focused on performing his due diligence and making sure there was full disclosure of all Title IX and related issues then pending or which were known and had not yet surfaced formally." *Id.*

During the hiring process, Plaintiff alleges that he had a conversation in November 2019 with Greg Simmons, the Vice President for Advancement who oversaw the UMBC Athletic

---

[2] Plaintiff sues Sheares Ashby in her individual and official capacity. *Id.* ¶ 5.

[3] The factual allegations are taken from Plaintiff's complaint, which the Court must, at this stage, "accept as true." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007).

Department. *Id.* ¶ 12. Plaintiff inquired as to whether there were Title IX or similar issues that were pending or being investigated. *Id.* Plaintiff "was told that the issues that led to the baseball player [sexual misconduct] lawsuit[4] had been addressed, that personnel changes had been made, and that the 'Retriever Courage Project' had been launched with the intent of teaming students, faculty, and administrators together to improve and enhance all Title IX processes." *Id.* Plaintiff was also allegedly told that the lawsuits had "served as a 'wake up call' to the University leading to a new focus on Title IX issues, so that scandals of this nature could not happen in the future." *Id.* Finally, Plaintiff was told that "the only other issue about which there was any knowledge involved a gender equity complaint against the UMBC Athletic Department based on the softball facility; however, this dispute was already being resolved." *Id.*

On or about November 24, 2019, Plaintiff asked several questions during an interview with the search committee related to the Title IX reporting structure at UMBC and "the handling of Title IX issues." *Id.* at 4–5 ¶ 13. According to the Complaint, "Lynne Schaeffer, the Vice President [of] Administration and Finance, responded that the University had undertaken a strong 'shared governance' response to the baseball lawsuit, and referenced the 'Retriever Courage Project' and how it had addressed and corrected prior issues." *Id.* at 5 ¶ 13. Schaeffer also allegedly stated that "the University was working on resolving the issues pertaining to the baseball and softball players, there were no other Title IX or similar issues in the Athletic Department, and that the Title IX Office was now active and thorough in its response and handling of any issues." *Id.*

---

[4] Plaintiff was focused on "learning about the status of the Title IX reporting process at UMBC and investigating recent legal issues relating to UMBC baseball players who had been accused of sexual misconduct, after which they had sued UMBC over the investigation it conducted." ECF 5, at 4 ¶ 12. Plaintiff references this investigation as "the baseball player lawsuit," *id.*, or "the baseball lawsuit," *id.* at 5 ¶ 13.

On or about November 24, 2019, Plaintiff asked during an interview with the search committee about the existing Athletic Department staff, and particularly Senior Staff, which included Chad Cradock, the Associate Athletic Director overseeing Aquatics who also served as the head swim coach. *Id.* ¶ 14. Allegedly in response to Plaintiff's questions about personnel issues or staffing changes, Senior Associate Athletic Director Gary Wohlstetter "answered in front of the entire Committee that the staff was very strong," and included "great people with a great work ethic and integrity." *Id.* Wohlstetter also "emphasized what a wonderful and highly regarded leader Cradock was, and that his dual roles [as coach of the swim team and Associate Athletic Director overseeing Aquatics] were a perfect fit for UMBC." *Id.*

In a one-on-one meeting with Wohlstetter on December 4, 2019, Wohlstetter allegedly "emphasized that Cradock was incredibly well-respected, ran the most successful program at UMBC, was a strong fundraiser, and was beloved on campus." *Id.* at 6 ¶ 16. In a one-on-one meeting with Schaeffer on December 4, 2019, Schaeffer "assured [Plaintiff] that [] issues [related to Title IX reporting] had been thoroughly addressed and resolved." *Id.* ¶ 17. Specifically, Schaeffer "assured Brian that other than the baseball and softball team issues that were already being resolved, there were no other issues in the Athletic Department and/or related to Title IX, discrimination, or harassment." *Id.* In a one-on-one meeting with then-UMBC President Freeman Hrabwoski on December 4, 2019, President Hrabwoski similarly "assured [Plaintiff] that the[] [structural] issues [related to Title IX reporting] had been resolved, and specifically referenced the Retriever Courage Project and the personnel/structural changes in the Title IX reporting structure, and that the Athletics Department and the Title IX Departments were now in outstanding shape and functioning as integrated units." *Id.* at 6–7 ¶ 18. President Hrabwoski also allegedly

4

represented that there were no current staff implicated in the issues around the baseball case, and "there were no other issues." *Id.*

Plaintiff also met with Jess Hammond, Abbie Day, Tom Mandato, and Steve Levy from the Athletic Department staff. *Id.* at 7 ¶ 19. After asking them questions, Plaintiff was allegedly "assured that Cradock was an important and respected leader, that he ran a model program, and that his presence on the senior staff was an asset." *Id.* They also allegedly "emphasized that there were no other issues, nothing [Plaintiff] needed to be concerned about, and nothing that he should see as an impediment to coming to UMBC." *Id.*

Plaintiff also met with Associate Vice President Valerie Thomas, who was responsible for Human Resources, and with the President's Chief-of-Staff, Candace Dodson-Reed. ECF 5, at 7–8 ¶ 20. According to the Complaint, "[n]either Thomas nor Dodson-Reed gave any indication that there were issues with any Athletics staff, that anyone had failed to share mandatory reports, or that there was a senior staff member and head coach in Athletics who had been the subject of repeated allegations of sexual misconduct." *Id.* Plaintiff also alleges that Simmons and General Counsel staff attorneys David Gleason, Bobbie Hoye and Chris Tkacik represented that all required protocols were being adhered to in resolution of the baseball and softball situations and "that there were no other Title IX issues or other pending allegations." *Id.* at 8 ¶ 21.

Plaintiff eventually accepted the UMBC offer after "[r]elying on representations from UMBC leadership and assurances that there had been full disclosure of all issues pertaining to" Title IX allegations, the Title IX office, and the relevant staff. *Id.* ¶ 22. Plaintiff arrived on campus in January 2020, but the campus was shut down in March 2020 due to COVID. *Id.* ¶ 23. Soon thereafter, student-athletes on the swim team allegedly "reported to [Plaintiff] extensive Covid protocol violations by Coach Cradock," and Plaintiff "promptly interviewed swim team members,

reported findings to the General Counsel and Title IX office, and suspended Coach Cradock." *Id.* at 8–9 ¶ 24. After the suspension, members of the swim team allegedly told Plaintiff that "they 'felt safe to report' Cradock's sexual abuse and assaults." *Id.* at 9 ¶ 25. Plaintiff allegedly acted quickly, which led to the removal of Cradock from his position. *Id.* Plaintiff asserts that before he initiated this process, Cradock "had been protected by the UMBC staff that covered up reports of his misconduct and touted his value to the University." *Id.* Plaintiff further contends that he was "responsible for 'blowing the whistle' on Coach Cradock and bringing an end to the abuse" against UMBC student athletes. *Id.* ¶ 26.

In February or March of 2024, the U.S. Department of Justice ("DOJ") issued its "Title IX Investigation of University of Maryland, Baltimore County." *Id.* ¶ 27. According to the Complaint, Plaintiff was particularly distressed from learning "how much the University had known about Cradock's abusive and illegal actions, and its cover up efforts, long before he was interviewed, and long before the UMBC officials who were part of his interview process repeatedly assured him that there were absolutely no Title IX or other allegations of misconduct involving or relating to the Athletic Department." *Id.* ¶ 28.

The DOJ report detailed extensive findings about the University's cover-up of Cradock's abuse but did not identify specific employees by name. *Id.* at 9–11 ¶ 28. Specifically, the report states that "[f]rom approximately 2015 to 2020, the University was on notice of allegations that these student-athletes had been subjected to a hostile environment based on sex but failed to address it adequately," *id.*, "[s]everal of [the male student-athletes] continued to endure [sexual] abuse even after a male student-athlete's report of sexual misconduct to the Athletics Department, which reached the Title IX Office in 2019," *id.*, and "[t]he University administrators and other staff were in receipt of allegations that the Head Coach sexually harassed male students at least as

early as 2015." *Id.* The report goes on to indicate that on June 29, 2015, a "staff member" received a letter from unidentified students reporting inappropriate conduct in the locker room, *id.*, and additionally, "University records show that shortly after receiving the letter, a member of the Athletics Department staff shared the letter with five other staff members." *Id.* The report also indicates that "[w]ord of the letter spread quickly among University senior administration and other Athletics Department staff." *Id.*

Additionally, "[i]n May 2019, a male student athlete told a member of the athletics staff that his head coach had kissed and hugged him without consent" and the staff member subsequently "reported the student's allegations to the Title IX Office and identified the Head Coach by name." *Id.* According to the report, "the staff member also informed their supervisor about the student's allegations against the Head Coach [and] [t]he supervisor, in turn, shared the allegations with other administrators in the Athletics Department," yet "[n]one of these individuals independently reported the allegations to the Title IX Coordinator, despite their obligation to do so." *Id.* Further, the report indicates that "[o]nce in receipt of the 2019 quasi-confidential report, the Title IX Office shared the allegations with several senior administrators." *Id.* And another paragraph of the report indicates that "[b]eginning as early as 2016, University administrators, including the Title IX Office, knew that the Head Coach was not reporting incidents of sexual harassment involving student-athletes to the Title IX Office, and was instead purporting to handle such incidents himself." *Id.* In short, Plaintiff alleges that the DOJ report detailed "how much [UMBC] had known about Cradock's abusive and illegal actions, and its cover up efforts, long before he was interviewed, and long before the UMBC officials who were part of his interview process repeatedly assured [Plaintiff] that there were absolutely no Title IX or other allegations of misconduct involving or relating to the Athletic Department." *Id.* at 9 ¶ 28. Additionally, the

report confirms the Title IX Office "responded in a clearly unreasonable manner," and "never addressed this misconduct or otherwise attended to the culture of non-reporting that [the Head Coach] fostered among his team and staff." *Id.*

On February 9, 2024, Plaintiff "brought to UMBC President Sheares Ashby's attention that he was being pursued by a prestigious institution with a better funded Athletic Department for its Athletic Director position." ECF 5, at 12 ¶ 30. According to the Complaint, "President Sheares Ashby encouraged [Plaintiff] to remain at UMBC and promised that on behalf of UMBC she would be signing an extension of his contract through 2028." *Id.* at 11 ¶ 28.

On March 14, 2024, President Sheares Ashby informed Plaintiff that she intended to terminate his contract. *Id.* ¶ 32. On March 18, 2024, President Sheares Ashby released a statement, which contained the following language:

> We have also reset the Athletic Department's structure, governance, and reporting mechanisms, starting with making the athletic director a direct report to me. Together, these actions represent an important and necessary set of first steps; there is much more work to do . . . The failures between 2015 and 2020 identified by the DOJ were the collective responsibility of many individuals. Those who were identified as failing to comply with their Title IX obligations—whether through action or inaction—will be held accountable.

*Id.* ¶ 33. On March 19, 2024, Plaintiff alleges that he "told Sheares Ashby and UMBC that these representations were false, and though they acknowledged he was correct, UMBC and Sheares Ashby rejected [Plaintiff's] request for UMBC to issue a public statement exonerating [Plaintiff] or separating him from the DOJ Report findings." *Id.* at 13 ¶ 35. Plaintiff was fired the same day. *Id.* at 12 ¶ 33.

Plaintiff also incorporated into the Complaint a paragraph from a story published in the Baltimore Sun related to the DOJ report, which stated:

> K, a male former UMBC swimmer, said [Plaintiff] was part of why he felt safe reporting Cradock's behavior in 2020. "K" agreed to be identified by his first initial.

"[Plaintiff] had done quite a few things to make me feel like I wasn't going to get persecuted." In part, [Plaintiff] had told him that his role as athletic director was to ensure student-athletes were safe and able to perform academically and athletically, not to protect coaches. "That was a big thing for me," K said. K didn't know why [Plaintiff] and the UMBC were parting ways, but he said if [Plaintiff] was being pushed out because of the Justice Department's findings, he found that perplexing. "[I]t feels like they're just doing it to save face[,]" K said. "I don't know if they're getting rid of the right administration. I think there were probably people who knew more and we[re] more responsible."

*Id.* at 13–14 ¶ 37 (cleaned up). Plaintiff asserts that he "should have been applauded for his actions in quickly taking steps to remove Cradock from being in a position to continue with his physical and mental abuse, and for getting the Athletics Department back on track in the aftermath of Cradock and the cover up," but "instead, he was fired and linked to the abuse and misconduct by Sheares Ashby and UMBC." *Id.* at 13 ¶ 36.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) governs dismissals for failure to "state a claim upon which relief can be granted." In considering a motion under this rule, courts discount legal conclusions stated in the complaint and "accept as true all of the factual allegations contained in the complaint." *Erickson,* 551 U.S. at 94; *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A court then draws all reasonable inferences in favor of the plaintiff and considers whether the complaint states a plausible claim for relief on its face. *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 253 (4th Cir. 2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

"The complaint must offer 'more than labels and conclusions' or 'a formulaic recitation of the elements of a cause of action[.]'" *Swaso v. Onslow Cnty. Bd. of Educ.*, 698 F. App'x 745, 747 (4th Cir. 2017) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). At the same time, a "complaint will not be dismissed as long as [it] provides sufficient detail about [the plaintiff's]

claim to show that [the plaintiff] has a more-than-conceivable chance of success on the merits." *Owens v. Balt. City State's Att'ys Off.*, 767 F.3d 379, 396 (4th Cir. 2014).

In addition, because Plaintiff's allegations in Count I sound in fraud, he is subject to the heightened pleading standards of Rule 9(b). *See* Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."). Under this heightened pleading standard, Plaintiff must allege "the time, place, and contents" of the fraudulent representation, the identity of the person who made the misrepresentation, and "what he obtained thereby." *See Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999). In other words, a plaintiff must plead the "who, what, when, where, and how of the alleged fraud." *U.S. ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 379 (4th Cir. 2008) (internal quotation marks and citations omitted). "A court should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which [it] will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts." *Harrison*, 176 F.3d at 784.

## III.  ANALYSIS

Plaintiff brings five counts against Defendants. Count I is a claim of fraudulent inducement against Defendants UMBC and the Board of Regents alleging that each "made intentional misrepresentations of material facts, for the purpose of inducing [Plaintiff] to accept the Athletic Director position." ECF 5, at 14. Count II alleges that Defendants UMBC, the Board of Regents, and President Sheares Ashby violated Title IX by unlawfully terminating Plaintiff to punish him for reporting Cradock's behavior to UMBC officials. *Id.* Count III is a claim of promissory estoppel/detrimental reliance against Defendants UMBC, the Board of Regents, and President Sheares Ashby because Plaintiff "passed on [another] employment opportunity and remained with UMBC" after he was promised a contract extension. *Id.* at 15. Count IV is a claim of libel against

10

Defendants UMBC, the Board of Regents, and President Sheares Ashby based on the termination of Plaintiff at the same time a public statement was published that Plaintiff alleges "falsely communicat[ed] that [Plaintiff] was 'responsible' and being 'held accountable'" for Cradock's misconduct. *Id.* at 16. Count V is a claim of libel by implication against Defendants UMBC, the Board of Regents, and President Sheares Ashby similarly based on the public statement and Plaintiff's concurrent termination. *Id.* Defendants move to dismiss all Counts. *See generally* ECF 11-1. The Court will address each Count in turn.

### A.   Fraudulent Inducement

Under Maryland law, "'[f]raud encompasses, among other things, theories of fraudulent misrepresentation, fraudulent concealment, and fraudulent inducement.'" *Sass v. Andrew*, 832 A.2d 247, 261 (Md. App. 2003) (citation omitted). "The tort of fraudulent inducement 'means that one has been led by another's guile, surreptitiousness or other form of deceit to enter into an agreement to his detriment.'" *Rozen v. Greenberg*, 886 A.2d 924, 929 (Md. 2005) (quoting *Sec. Constr. Co. v. Maietta*, 334 A.2d 133, 136 (Md. App. 1975)). In Maryland, to prevail on a fraud claim, a plaintiff must show:

> (1) that the defendant made a false representation to the plaintiff, (2) that its falsity was either known to the defendant or that the representation was made with reckless indifference as to its truth, (3) that the misrepresentation was made for the purpose of defrauding the plaintiff, (4) that the plaintiff relied on the misrepresentation and had the right to rely on it, and (5) that the plaintiff suffered compensable injury resulting from the misrepresentation.

*Moscarillo v. Pro. Risk Mgmt. Servs., Inc.*, 921 A.2d 245, 254 (Md. 2007) (quotation marks and citation omitted); *see also Thomas v. Nadel*, 48 A.3d 276, 282 n.18 (Md. 2012). The plaintiff must establish the elements of fraud "by clear and convincing evidence." *Md. Envir. Trust v. Gaynor*, 803 A.2d 512, 516 (Md. 2002).

To be actionable, a false representation "must be of a material fact." *Gross v. Sussex, Inc.*, 630 A.2d 1156, 1161 (Md. 1993). "A 'material' fact is one on which a reasonable person would rely in making a decision," *Sass*, 832 A.2d at 260, or a fact that "'the maker of the misrepresentation knows ... [the] recipient is likely to regard ... as important.'" *Gross*, 630 A.2d at 1161 (citation omitted). Moreover, the "misrepresentation must be made with the deliberate intent to deceive." *Sass*, 832 A.2d at 260 (citing *VF Corp. v. Wrexham Aviation Corp.*, 715 A.2d 188 (Md. 1998)). And, the defendant must "know[] that his representation is false" or be "recklessly indifferent in the sense that he knows that he lacks knowledge as to its truth or falsity." *Ellerin v. Fairfax Savings, F.S.B.*, 652 A.2d 1117 (Md. 1995).

### 1. Defendant UMBC

Defendant UMBC argues that Plaintiff has "not plausibly alleged that any of the University employees he spoke with during his recruitment process (1) asserted false representations of a material fact; (2) knew that the representations were false or that the representations were made with reckless disregard for the truth; and that they (3) made the false representations for the purpose of defrauding [Plaintiff]." ECF 11-1, at 8–9. Plaintiff responds that "Defendants UMBC and the Board are liable for fraudulently inducing [him] to accept the position of UMBC's Athletic Director by repeatedly and intentionally misrepresenting to [Plaintiff] during his interview process that the University [was] unaware of any undisclosed Title IX violations, and that there were no other issues relating to the Athletic Department being investigated or about which there should be any concerns." ECF 14, at 13 (citing ECF 5, at 11, 14 ¶¶ 29, 39–42). Specifically, Plaintiff argues "[t]he Complaint [] alleges in detail the DOJ Report's findings that the University and its officials, including the Athletic Department staff and senior administration officials, were clearly aware of Cradock's abuse and Title IX violations as early as 2015, and that this information was effectively

covered up, which information [Plaintiff] learned of when the DOJ issued its Report in or about March 2024." *Id.* at 14 (citing ECF 5, at 9–11 ¶ 28).

In the Complaint, Plaintiff alleges that "UMBC leadership lied to [Plaintiff] in order to induce him to accept employment as Athletic Director—a position that UMBC was desperate to fill, given that it had been open for months, and University officials knew, according to the DOJ Report, of the pending Cradock issues and their own cover-up." ECF 5, at 11 ¶ 29. Plaintiff also incorporates findings from the DOJ report, which state that numerous University administrators, Athletic Department staff, and University staff, were, at minimum, "on notice" of allegations of Cradock's sexual misconduct and Title IX violations at the time of Plaintiff's hiring, but nonetheless failed to disclose them to Plaintiff even when Plaintiff specifically asked about "Title IX or other allegations of misconduct involving or relating to the Athletic Department." *See* ECF 5, at 9–11 ¶ 28. These allegations are sufficient to plead knowledge of falsity of the statements made during the hiring process, even though the DOJ report did not name specific employees. Importantly, "[f]raud is not a single fact but a conclusion to be drawn from all of the circumstances of the case." *Fuller v. Horvath*, 402 A.2d 134, 142 (Md. App. 1979) (citations omitted). Here, given the DOJ's findings, along with other allegations in the Complaint, Plaintiff has plausibly alleged that the representations made to Plaintiff during the interview process by Greg Simmons, the Vice President of Advancement, Lynne Schaeffer, the Vice President of Administration and Finance, Senior Associate Athletic Director Gary Wohlstetter, UMBC President Hrabowski, the University's search committee, and the University's Athletic Department staff, were false and the persons making such statements knew they were false. Additionally, Defendants' argument that there are insufficient facts to support a finding of knowledge fails because at the pleading stage, state of mind may be alleged generally. *See* Fed. R. Civ. P. 9(b) (stating that "[m]alice, intent,

knowledge, and other conditions of a person's mind may be alleged generally"); *see also Fuller v. Horvath*, 402 A.2d 134, 142 (Md. App. 1979) ("Fraud is a scienter tort consisting of the representation of a material fact that is false, deceptive and injurious. Although fraudulent intent is a necessary element, a legal inference of fraud is permissible from the conduct of the parties, without regard to their [actual] intent." (citations omitted)). The DOJ report documents the widespread nature of the cover-up, which included high-level officials and Athletic Department staff. ECF 5, at 9–11 ¶ 28. Thus, the report's findings (as cited in the Complaint), along with Plaintiff's allegations about the specific employees' representations during the hiring process, are enough to create a reasonable inference of knowledge at this early stage of litigation even though the Complaint does not specifically allege how each individual person came to know of the allegations of Cradock's sexual misconduct.

More broadly, the Complaint is also sufficiently detailed to state a plausible claim for fraudulent inducement despite the heightened pleading standard. When Defendants have "been made aware of the particular circumstances for which [they] will have to prepare a defense at trial," and when "the plaintiff has substantial prediscovery evidence of those facts," courts "should hesitate to dismiss a complaint under Rule 9(b)." *Harrison*, 176 F.3d at 784. These conditions exist here. Plaintiff, with the assistance of pre-discovery evidence in the form of the DOJ report, has identified in detail the circumstances surrounding his hiring process at UMBC. Plaintiff specifically alleges "the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *See Weidman v. Exxon Mobil Corp.*, 776 F.3d 214, 219 (4th Cir. 2015) (citations omitted). Plaintiff indicates that his recruitment "started with a November 2019 conversation with Greg Simmons, the Vice President for Advancement who oversaw the UMBC Athletic Department," in which Plaintiff was told that

14

"the only other [Title IX] issue about which there was any knowledge involved a gender equity complaint against the UMBC Athletic Department based on the softball facility; however, this dispute was already being resolved," and "there were no other issues." ECF 5, at 4 ¶ 12. Plaintiff then goes on to detail representations made by, among others, Lynne Schaeffer, the Vice President of Administration and Finance, during an interview with the search committee on or about November 24, 2019 about the lack of outstanding Title IX issues, *id.* at 4–5 ¶ 13, statements by Senior Associate Athletic Director Gary Wohlstetter on or about November 24, 2019, during an interview with the search committee about what a "wonderful and highly regarded leader Cradock was," and that his "dual roles were a perfect fit for UMBC," *id.* at 5 ¶ 14, and representations by the Athletic Department staff, including Jess Hammond, Abbie Day, Tom Mandato, and Steve Levy, about the changes made to the Title IX issues, the resolution of past issues, and the lack of remaining Title IX issues. *Id.* at 7 ¶ 19. Plaintiff also put forth specific factual allegations regarding similar representations made by then-UMBC President Freeman Hrabwoski, *id.* at 6 ¶ 18, Associate Vice President Valerie Thomas, *id.* at 7–8 ¶ 20, the President's Chief-of-Staff, Candace Dodson-Reed, *id.*, and General Counsel staff attorneys David Gleason, Bobbie Hoye and Chris Tkacik, *id.* at 8 ¶ 21. Finally, Plaintiff specifically alleges that "UMBC leadership lied to [him] in order to induce him to accept employment as Athletic Director—a position that UMBC was desperate to fill, given that it had been open for months, and University officials knew, according to the DOJ Report, of the pending Cradock issues and their own cover-up." *Id.* at 11 ¶ 29. The Court has reviewed the Complaint in depth and finds that Plaintiff "state[s] with particularity the circumstances constituting fraud or mistake," Fed. R. Civ. P. 9(b), by clearly alleging the "who, what, when, where, and how of the alleged fraud," and therefore the Complaint

is sufficient to put Defendants on notice of the action. *U.S. ex rel. Wilson*, 525 F.3d at 379 (citation and quotation marks omitted). Thus, the Court denies UMBC's motion to dismiss as to Count I.

### ·2.  Defendant Board of Regents

As to the Board of Regents, Defendants aver that "[t]here are no allegations in the complaint that any Board of Regents members made any statements to [Plaintiff], let alone any false or fraudulent statements," and thus it is "clear the Board is simply being named as the governing body for the University, not because of any fraud." ECF 11-1, at 9.  Plaintiff, on the other hand, cites several cases holding that the Board of Regents can be held liable for unlawful conduct committed by employees in light of the authority and control it exercises over the constituent institutions.  ECF 14, at 20–21 (citing *Jennings v. Frostburg State Univ.*, Civ. No. ELH-21-656, 2021 WL 5989211, *6–7 (D. Md. 2021), *Jean v. Bd. of Regents of Univ. Sys. of Md.*, Civ. No. WDQ-13-0117, 2013 WL 3873948, at *2 (D. Md. 2013), and *Innes v. Bd. of Regents of Univ. Sys. of Md.*, 29 F. Supp. 3d 566, 569 (D. Md. 2014)).  Defendants respond that *Jean* and *Innes* "involved claims brought under the Americans with Disabilities Act ("ADA") or the Rehabilitation Act and essentially stand for the proposition that the Board of Regents retains ultimate control over policies despite having the ability to delegate authority to presidents and various universities it oversees." ECF 15, at 4.  According to Defendants, Plaintiff "offers no factual evidence that any Board of Regents members made any statements whatsoever," and Plaintiff does not allege "that there was a federal statute like the ADA, or a school policy, that was violated by the University, thereby implicating the Board of Regents." *Id.*

The Court finds Plaintiff's argument more persuasive in light of the relevant case law.  In *Jennings*, Judge Hollander allowed employment discrimination and retaliation claims under Section 504 of the Rehabilitation Act and the Maryland Fair Employment Practices Act

16

("MFEPA") to survive a motion to dismiss despite defendants' argument that the complaint failed to state a claim against the Board of Regents because there were no facts "concerning the involvement of . . . the Board with respect to plaintiff's employment or termination." 2021 WL 5989211, at *6. Judge Hollander reasoned that "[j]udges of this court have previously concluded that, in light of the authority and control that the Board [] may exercise over the constituent institutions, [it] may be held liable for unlawful conduct committed by the employees of [] these institutions." *Id.* at *6 (collecting cases). While the claims in *Jennings* involved employment discrimination and retaliation, rather than a tort claim, the Court is nonetheless persuaded by Judge Hollander's reasoning that, "the outcome[] . . . [does] not turn on the level of involvement of [the University System of Maryland] or the Board with regard to the underlying conduct," but instead, "turn[s] on the degree of control that the Board . . . may exercise over their constituent institutions." *Id.* at *7 (first citing *Jean*, 2013 WL 3873948, at *2, then citing *Innes*, 29 F. Supp. 3d at 576–77).

Under Maryland law, the Board "[i]s responsible for the management of the University System of Maryland and has all the powers, rights, and privileges that go with that responsibility." Md. Code (2018 Repl. Vol., 2019 Supp.), § 12–104(c)(1) of the Education Article ("Educ."). Under Educ. § 12-104(b)(3), the Board may "[s]ue and be sued, complain, and defend in all courts." Judges in this District have allowed cases to proceed against the Board of Regents despite the Board's lack of direct involvement in the underlying conduct. *See, e.g., Jean*, 2013 WL 3873948, at *2 ("Although the Board's management of [the constituent university] has been delegated to [the President of the constituent university] by statute, the statute is equally clear that the Board retains ultimate responsibility for the entire University System. (alterations added) (citing Md. Code Ann., Educ. § 12-104(k)(1) and §§ 12-104(c)(1), 12-109(d)(2)); *Jennings*, 2021

WL 5989211, at *7 (allowing claims against Board of Regents to survive motion to dismiss because "the defense offers no legal authority to support the proposition that the degree of involvement is a factor in resolution of a motion to dismiss"). So too here. Defendants provide no authority to support their argument that the Board's lack of direct involvement in employees making allegedly false statements insulates them from liability, and Defendants failed to address *Jennings* in the Reply or otherwise explain why its reasoning should not extend to this case. Therefore, considering the case law provided by Plaintiff and the Board's capacity to "sue and be sued," Educ. § 12–104(b)(3), the motion to dismiss will be denied as to the Board of Regents on Count I.

### 3. Statute of Limitations

Under Maryland law, the statute of limitations for a fraud claim is three years unless otherwise specified. *Donnelly v. Rosas*, Civ. No. RDB-17-1486, 2018 WL 3862233, at *4 (D. Md. Aug. 14, 2018) (citing Md. Code Ann., Cts. And Jud. Proc. § 5-101). To determine when the three years begins, Maryland recognizes the "discovery rule" which holds that "a cause of action accrues when a plaintiff in fact knows or reasonably should know of the wrong." *Id.* (quoting *Duffy v. CBS Corp.*, 182 A.3d 166 (Md. 2018)).

Defendants argue that Plaintiff "learned of Coach Cradock's alleged gender discrimination and sexual 'abuse and assaults' when members of the University swim team began reporting instances to him in 2020." ECF 11-1, at 9 (citing ECF 5, at 9 ¶ 25). Thus, according to Defendants, the claim arose in 2020 and because the action was not filed until September 19, 2024, the statute of limitations has expired. *Id.* Plaintiff argues that he "learned of the actions that form the basis of his fraudulent inducement claim in [or] around March 2024, when the DOJ Report was made public." ECF 14, at 23. While Plaintiff agrees that members of the swim team first reported

allegations to Plaintiff in or around March 2020, according to Plaintiff, "the Complaint does not allege that [he] had any idea at that point of UMBC's long history of covering up Cradock's abuse—the basis of his fraudulent inducement claim." *Id.* at 22 (citing ECF 5, at 9 ¶ 27).

At the outset, the Court notes that "the defense of limitations is ordinarily not considered in the context of a motion to dismiss." *State Auto. Mut. Ins. Co. v. Lennox*, 422 F. Supp. 3d 948, 964 (D. Md. 2019) (citations omitted). "However, 'when it appears on the face of the complaint that the limitation period has run, a defendant may properly assert a limitations defense through a Rule 12(b)(6) motion to dismiss.'" *Id.* (citations omitted).

After reviewing the face of the Complaint, and taking all allegations in the Complaint as true, there are sufficient facts at this stage of the litigation to support Plaintiff's allegation that the cause of action accrued in March 2024. Plaintiff specifically alleges that he learned of the University's role in the cover-up only after the DOJ report came out in March 2024, ECF 5, at 9 ¶¶ 27, 28, which is sufficient to plausibly allege that the cause of action accrued in March 2024. *See Brown v. Neuberger, Quinn, Gielen, Rubin & Gibber, P.A.*, 731 F. Supp. 2d 443, 449 (D. Md. 2010) ("[A] plaintiff's cause of action accrues when the plaintiff knows or reasonably should have known of the wrong." (citation omitted)). There are no facts in the Complaint that show that Plaintiff knew or reasonably should have known, before the DOJ report was released, that the statements made by university officials during the hiring process were false. Thus, the Court finds that the fraud claim is not barred by the statute of limitations on the face of the Complaint.

**B.    Retaliation**

1.    Claim against UMBC and Board of Regents

In Count II, Plaintiff brings a claim for retaliation under Title IX.[5] The Supreme Court has held that Title IX's ban on "discrimination" encompasses bans on retaliation, and that a private right of action is implied for that form of discrimination under the statute. *See Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173–84 (2005) (discussing the implied right of action under Title IX for retaliation). The Fourth Circuit has advised that "Title VII, and the judicial interpretations of it, provide a persuasive body of standards to which we may look in shaping the contours of a private right of action under Title IX." *Preston v. Va. ex rel. New River Cmty. Coll.*, 31 F.3d 203, 207 (4th Cir. 1994).

The Supreme Court has defined retaliation under Title IX as follows: "when a funding recipient retaliates against a person *because* he complains of sex discrimination, this constitutes intentional discrimination on the basis of sex, in violation of Title IX." *Jackson*, 544 U.S. at 174 (quotation marks omitted) (emphasis in original). A prima facie retaliation claim must show (1) engagement in a protected activity; (2) an adverse action; and (3) a causal connection between the protected activity and the adverse action. *See Coleman v. Md. Court of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010) (applying this retaliation framework to Title VII claims).

Defendants argue "[t]he complaint fails to allege facts that, if proved, provide the requisite causal connection between [] [Plaintiff's] alleged protected activity and his termination." ECF 11-1, at 11. Specifically, Defendants contend that the protected activity Plaintiff allegedly engaged in, namely reporting Cradock for allegations of sexual assault, occurred in the fall of 2020, but he

---

[5] Plaintiff asserts that UMBC is a recipient of federal funds within the meaning of 20 U.S.C. § 1681 (Title IX). *See* ECF 5, at 2 ¶ 3. Therefore, sovereign immunity does not apply to this claim. *See Litman v. George Mason Univ.*, 186 F.3d 544, 554 (4th Cir. 1999) (stating "by accepting Title IX funding, a state agrees to waive its Eleventh Amendment immunity"); *Kerr v. Marshall Univ. Bd. of Governors*, No. 14-cv-12333, 2015 WL 1405537, at *10 (S.D. W. Va. Mar. 26, 2015) (recognizing the Fourth Circuit's holding in *Litman* that receiving Title IX funding is an unambiguous waiver of Eleventh Amendment immunity).

was not fired until March 19, 2024, and thus he cannot establish a "but-for" causal connection. *Id.* at 10–11. Plaintiff responds that "[a]lthough Plaintiff 'blew the whistle' on Cradock in 2020, UMBC continued to cover up the actions of Cradock and failed to properly respond thereafter; as Plaintiff later learned, UMBC leadership had, by then, actively covered for Cradock for years already, as alleged in the Complaint and found in the DOJ Report." ECF 14, at 27 (citing ECF 5, at 9–11 ¶ 28). In short, Plaintiff maintains that "[Plaintiff] initiated the process that led to the DOJ Report," and that "the DOJ Report [came] out and [Plaintiff] [was] immediately fired, for no reason other than that the DOJ Report came out, slamming UMBC and its leadership." *Id.* (citing ECF 5, at 12–14 ¶¶ 31–38). According to Plaintiff, the "few weeks between when the DOJ Report was issued and [Plaintiff's] discharge [is] easily sufficient to state a claim." *Id.* at 29.

"Causation can be shown in two ways: by 'show[ing] that the adverse act bears sufficient temporal proximity to the protected activity,' or by showing 'the existence of facts that suggest that the adverse action occurred because of the protected activity,' or a combination of the two." *Laurent-Workman v. Wormuth*, 54 F.4th 201, 218–19 (4th Cir. 2022) (quoting *Smith v. CSRA*, 12 F.4th 396, 417 (4th Cir. 2021)). The Fourth Circuit has acknowledged that "intervening events can bridge what would otherwise be a prohibitively long temporal gap." *See Holloway v. Maryland*, 32 F.4th 293, 300 (4th Cir. 2022) (citation omitted). Plaintiff must "show that the decisionmaker was aware of the protected activity at the time the alleged retaliation occurred." *Roberts v. Glenn Indus. Grp.*, 998 F.3d 111, 124 (4th Cir. 2021).

The Court finds that a lapse of nearly four years between the protected activity and the adverse action is "'sufficiently long so as to weaken significantly the inference of causation.'" *Horne v. Reznick Fedder & Silverman*, 154 F. App'x 361, 364 (4th Cir. 2005) (quoting *King v. Rumsfeld*, 328 F.3d 145, 151 n.5 (4th Cir. 2003)). However, at this early stage of litigation, the

Court is satisfied that the short period between the DOJ report coming out and Plaintiff's subsequent discharge satisfies the causal nexus because the DOJ report was allegedly a direct result of Plaintiff reporting Cradock in 2020. *See Lettieri v. Equant Inc.*, 478 F.3d 640, 650 (4th Cir. 2007) ("In cases where temporal proximity between protected activity and allegedly retaliatory conduct is missing, courts may look to the intervening period for other evidence of retaliatory animus." (citations and quotation marks omitted)). In short, the DOJ investigation and report "tempers the temporal gap" between Plaintiff's protected activity (reporting Cradock) and his termination. *Holloway*, 32 F.4th at 300; *see also King*, 328 F.3d at 151 n.5 (evaluating the effect of length of time passing on the inference of causation and explaining that the court takes into account "the context of th[e] particular employment situation"). Taking the facts in the Complaint as true, Plaintiff has plausibly alleged "that the adverse action occurred because of the protected activity," *Laurent-Workman*, 54 F.4th at 218–19, by alleging that he "identified, reported and ended the Cradock abuse," ECF 5, at 12 ¶ 31, "had not engaged in any wrongdoing," *id.*, but was nevertheless "[s]capegoated" and "fired by UMBC," *id.* at 12, 14 ¶¶ 31, 38, just weeks after the DOJ report was released, which documented "the lengths to which the UMBC Administration went in covering [allegations of misconduct] up," *id.* at 9 ¶ 27.

Defendants contend that "[t]he release of the DOJ report in 2024 does nothing to advance [Plaintiff's] argument because the University had knowledge of [his] protected activity in 2020 and did not terminate him at that time." ECF 15, at 6. Plaintiff alleges, however, that "[i]t was [his] reporting of Cradock that led to the sequence of events that culminated in the DOJ Report and the Cradock cover-up being exposed." ECF 14, at 31. In short, Plaintiff plausibly alleges but-for causation by asserting that he reported Cradock for sexual misconduct in 2020, which led to Cradock's removal from his position, ECF 5, at 9 ¶ 25, the DOJ issued a report in February or

March 2024 detailing the "depth of the misconduct committed by Cradock and the lengths to which the UMBC Administration went in covering it up," *id.* ¶ 27, President Sheares Ashby then issued a statement on March 18, 2024 indicating that "[t]hose who were identified as failing to comply with their Title IX obligations—whether through action or inaction—will be held accountable," *id.* at 12 ¶ 33, and then, one day later, Plaintiff was fired, *id.* Plaintiff alleges that, despite confirmation that he had not engaged in any wrongdoing, *id.* at 12 ¶ 31, he was fired after the DOJ report was released because he "identified, reported and ended the Cradock abuse and support that had been covered up by the University, and [] worked tirelessly to get the Athletic Department on the proper path when it came to Title IV compliance," *id.* Accordingly, accepting the facts as true and drawing all reasonable inferences in favor of Plaintiff, it is plausible that if Plaintiff had not reported Cradock, there would not be a DOJ report, and Plaintiff would not have been fired after its release to the public. Thus, the Court declines to dismiss Count II against UMBC and the Board of Regents for failure to state a claim.

### 2. Claim against President Sheares Ashby

Defendants argue that the claim for retaliation against President Sheares Ashby should be dismissed because "[t]he institution, not the individual employee, is the recipient of federal funds and is subject to liability for a violation of Title IX." ECF 11-1, at 11. Plaintiff does not respond to Defendants' argument regarding personal liability other than stating that the Court "should remand this action to the Circuit Court of Howard County, Maryland, pursuant to 28 U.S.C. § 1447(c)" if the Court finds that the claims against Defendant Sheares Ashby under Count II should be dismissed. ECF 14, at 34. Because Plaintiff failed to substantively respond to Defendants' argument that there is no personal liability available against Defendant Sheares Ashby, the Court finds that Plaintiff abandoned this claim. *See Ferdinand-Davenport v. Childs. Guild*, 742 F. Supp.

2d 772, 783 (D. Md. 2010) (holding that "[b]y [plaintiff's] failure to address these arguments in her opposition to [defendant's] motion to dismiss, [plaintiff] has abandoned this claim" (citing *Mentch v. Eastern Savings Bank, FSB*, 949 F. Supp. 1236, 1247 (D. Md. 1997)).

In any event, the claim should be dismissed because it is well-established that Title IX does not authorize suit against school officials. Title IX applies to institutions and programs that receive federal funds but "it has consistently been interpreted as not authorizing suit against school officials, teachers, and other individuals." *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 257 (2009) (citations omitted); *Klug v. Marshall Univ. Joan C. Edwards Sch. Of Med.*, Civ. No. 18-0711, 2019 WL 1386403, at *5 (S.D. W. Va. Mar. 27, 2019) (dismissing school officials from Title IX claims in both individual and official capacities). Accordingly, the Title IX retaliation claim against Defendant Sheares Ashby must be dismissed.

In the Complaint, Plaintiff brings Count II against Defendants UMBC, Board of Regents, and President Sheares Ashby. ECF 5, at 14. While the Court dismisses the retaliation claim against Defendant Sheares Ashby, the Court allows the retaliation claim to proceed against Defendants UMBC and the Board of Regents. Accordingly, the Court maintains subject matter jurisdiction over the case, and the case will not be remanded to state court. Additionally, "[a] district court's decision whether to exercise [supplemental] jurisdiction after dismissing every claim over which it had original jurisdiction is purely discretionary." *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009) (citing § 1367(c)). Thus, while there is no longer federal question jurisdiction as to Defendant Sheares Ashby, the Court exercises its discretion to retain jurisdiction over Plaintiff's state law claims against Defendant Sheares Ashby. *See Osborn v. Haley*, 549 U.S. 225, 245 (2007) ("Even if only state-law claims remained after resolution of the federal question, the District Court would have discretion, consistent with Article III, to retain jurisdiction.").

## C. Promissory Estoppel

Plaintiff brings a claim for promissory estoppel/detrimental reliance in Count III, alleging that "President Sheares Ashby encouraged [Plaintiff] to remain at UMBC and made a clear and definite promise that she would be signing an extension of his contract through 2028," and "[i]n reliance on this clear and definite promise, [Plaintiff] passed on [another] employment opportunity and remained with UMBC." ECF 5, at 15 ¶ 49. Defendants argue that "[t]his claim is barred by sovereign immunity because the State of Maryland has not waived immunity for quasi-contractual claims." ECF 11-1, at 12. Specifically, Defendants contend that "[t]here was no written contract signed by a state officer with authority to enter into a contract, as [Plaintiff's] claim is based entirely on a purported conversation, which is insufficient to constitute a waiver of sovereign immunity." *Id.* at 13. Plaintiff does not respond to Defendants' arguments about Count III, other than to state in a footnote that "[t]o the extent that this Court agrees with Defendants' arguments as to the applicability of Md. Code, State Gov't, § 12-201(a) to Plaintiff's claims under Count III [], Plaintiff expressly reserves the right to seek leave to amend the Complaint should further information become known to Plaintiff supporting a cause of action in tort or otherwise relating to Defendant [Sheares] Ashby's promise to continue and extend Plaintiff's employment contract." ECF 14, at 34 n.2.

Considering Plaintiff's failure to substantively respond to Defendants' arguments about sovereign immunity, the Court deems Plaintiff's claim under Count III abandoned. Even if the claim had not been abandoned, however, it should be dismissed because Maryland has not waived sovereign immunity for quasi-contractual claims, and the waiver of sovereign immunity applies only to written contracts.

Maryland's waiver of sovereign immunity states: "the State, its officers, and its units may not raise the defense of sovereign immunity in a contract action, . . . based on a written contract that an official or employee executed for the State . . . while the official or employee was acting within the scope of the authority of the official or employee." Md. Code Ann., State Gov't., § 12-201(a). "The Maryland Court of Appeals has interpreted this provision to mean that the contract in dispute must be both 'reduced to writing' and 'signed by a person expressly authorized to execute the contract.'" *Student "B" v. Howard Cnty. Cmty. Coll.*, 512 F. Supp. 3d 610, 615 (D. Md. 2021) (citing *Stern v. Bd. of Regents, Univ. Sys. of Md.*, 846 A.2d 996 (Md. 2004)).

As a threshold matter, and as Defendants point out, UMBC and the University System of Maryland are State entities. *See* Md. Code Ann., Educ. § 12-101(b)(6) (stating that the University of Maryland, Baltimore County is a constituent institution under the jurisdiction of the Board of Regents of the University System of Maryland); *id.* § 12-102(a) (stating that "[t]here is a body corporate and politic known as the University System of Maryland," which "is an instrumentality of the State and a public corporation" and "an independent unit of State government"); *see also Md. Stadium Auth. v. Ellerbe Becket, Inc.*, 407 F.3d 255, 265 (4th Cir. 2005) (describing the University System of Maryland as an "alter ego of Maryland"). President Sheares Ashby was sued in her official capacity as President of the University, and thus the claims against Sheares Ashby are also claims against UMBC.[6] Thus, sovereign immunity applies unless Maryland has waived it. Here, Plaintiff's claim is based on an oral representation, not a written contract, and therefore the claim is barred because the waiver of sovereign immunity applies only to written contracts. *See* Md. Code Ann., State Gov't., § 12-201(a); *see also Balt. City Bd. of School Comm'rs v. Koba*

---

[6] Plaintiff has not made any arguments related to the claim under Count III against President Sheares Ashby in her individual capacity, and thus the Court deems that argument abandoned and declines to further address it here.

*Inst., Inc.*, 5 A.3d 60, 68 (Md. App. 2010) ("However meritorious a claim based on an implied contract may be, if that claim is against the State or any of its agencies, it is barred because it is not based upon a written contract.") (citations omitted).

### D.    Libel and Libel by Implication

#### 1.    Failure to State a Claim

In Count IV and Count V, Plaintiff alleges that "[o]n March 18, 2024, President Sheares Ashby and UMBC published a defamatory and libelous statement to the world," by stating that "[t]he failures between 2015 and 2020 identified by the DOJ were the collective responsibility of many individuals," and "[t]hose who were identified as failing to comply with their Title IX obligations—whether through action or inaction—will be held accountable." ECF 5, at 16 ¶ 53. According to Plaintiff, he was terminated the day after this statement was released, and he "requested that a statement be issued clarifying that there were no findings of wrongdoing on his part," but President Sheares Ashby and UMBC "refused." *Id.* Defendants move to dismiss these Counts because the statement issued by President Sheares Ashby did "not identify any individual by name," ECF 11-1, at 14 (citing ECF 5, at 12 ¶ 33), the statement "refers to the 'collective responsibility' of 'many individuals' who were identified by the DOJ as failing to comply with Title IX," *id.* (citing ECF 5, at 12 ¶ 33), and "the quoted language from the DOJ report fails to identify any UMBC employee by name," *id.* at 14–15 (citing ECF 5, at 9–11 ¶ 28). Defendants argue that "[g]iven that the statement issued by the University refers to many individuals in the collective sense, there is no plausible way that [Plaintiff] can assert that the allegedly defamatory statement refers to some 'ascertainable person' and that person is him." *Id.* at 15. Plaintiff maintains that "[t]he statement announces a 'reset' of the Athletic Department that [he] at the time led, specifically identifies the Athletic Director role as a position in need of reform to address

UMBC's inexplicable coverup of Cradock's misconduct and abuse, promises that 'those identified as failing to comply with their Title IX obligations . . . will be held accountable,' and then is swiftly followed by the separate announcement of [Plaintiff's] termination." ECF 14, at 32 (citing ECF 5, at 12, 16 ¶¶ 33, 53). According to Plaintiff, the statements and termination "impart[ed] a meaning from which third persons could infer that [he] was one of those persons who were 'identified as failing to comply with Title IX obligations' and would 'be held accountable.'" *Id.* Plaintiff has also alleged that because he was "[s]capegoated by UMBC and connected to the Cradock/UMBC debacle," he has not been able to obtain employment and is effectively "unhirable." ECF 5, at 14 ¶ 38.

Under Maryland law, "[a] mere inference, implication, or insinuation is as actionable as a positive assertion if the meaning is plain. The test is whether the words, taken in their common and ordinary meaning, in the sense in which they are generally used, are capable of defamatory construction." *Batson v. Shiflett*, 602 A.2d 1191, 1211 n.14 (Md. 1992) (citing *Bowie v. Evening News*, 129 A. 797, 799 (Md. 1925)). To state a claim for defamation, a plaintiff must allege facts showing "(1) that the defendant made a defamatory statement to a third person, (2) that the statement was false, (3) that the defendant was legally at fault in making the statement, and (4) that the plaintiff thereby suffered harm." *Piscatelli v. Van Smith*, 35 A.3d 1140, 1147 (Md. 2012). A defamatory statement must "refer to some ascertained or ascertainable person, and that person must be the plaintiff." *Great Atl. & Pac. Tea Co. v. Paul*, 261 A.2d 731, 736 (Md. 1970); *see also Publish Am., LLP v. Stern*, 84 A.3d 237, 247 (Md. App. 2014).

For purposes of the first element, "[a] defamatory statement is one which tends to expose a person to public scorn, hatred, contempt or ridicule, thereby discouraging others in the community from having a good opinion of, or from associating or dealing with, that person."

*Batson*, 602 A.2d at 1210 (citing *Bowie*, 129 A. at 799). "The threshold question of whether a publication is defamatory in and of itself, or whether, in light of the extrinsic facts, it is reasonably capable of a defamatory interpretation is for the court upon reviewing the statement as a whole; words have different meanings depending on the context in which they are used and a meaning not warranted by the whole publication should not be imputed." *Id.* (citation omitted). In other words, "the courts must consider the [statement] as a whole to arrive at the true meaning of the specific words and phrases." *Phillips v. Wash. Mag., Inc.*, 472 A.2d 98, 101 (Md. App. 1984) (citations omitted). In making this determination, the Court cannot "separate words or phrases from the context." *Kilgour v. Evening Star Newspaper Co.*, 53 A. 716, 718 (Md. 1902). Under the second element, a "false statement is one that is not substantially correct." *Batson*, 602 A.2d at 1212 (citation omitted). The plaintiff carries the burden of proving falsity. *Id.*

Moreover, "[a] plaintiff may base a claim for defamation on what is allegedly implied rather than specifically stated." *Harvey v. Cable News Network, Inc.*, 520 F. Supp. 3d 693, 715 (D. Md. 2021) (citing *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1092 (4th Cir. 1993)). "The language must not only be reasonably read to impart the false innuendo, but it must also affirmatively suggest that the author intends or endorses the inference." *Id.* (citations omitted).

The language in the press release issued by President Sheares Ashby, including the key sentence, "We have [] reset the Athletic Department's structure, governance, and reporting mechanisms, starting with making the athletic director a direct report to me," ECF 5, at 12 ¶ 33, is enough to plausibly state a claim for libel given the context and under the circumstances of this case. While this is admittedly a close call given that the statement goes on to cite the "collective responsibility of many individuals," *id.*, the Court must draw all reasonable inferences in favor of Plaintiff at this early stage of litigation. *See Nemet Chevrolet, Ltd.*, 591 F.3d at 253. When doing

so, the Court finds that the statements are capable of defamatory meaning. Importantly, the press release states that "[t]hose who were identified as failing to comply with their Title IX obligations—whether through action or inaction—will be held accountable." ECF 5, at 12 ¶ 33. As Plaintiff points out, the statements "impart a meaning from which third persons could infer that [Plaintiff] was one of those persons who [was] 'identified as failing to comply with Title IX obligations' and would 'be held accountable,'" ECF 14, at 32, particularly given that Plaintiff alleges he was terminated the day after the press release issued, ECF 5, at 16 ¶ 53.

Defendants characterize the statement as little more than "a University President's statement concerning the restructuring of a particular department." ECF 15, at 8. However, that interpretation of the statement decontextualizes the language at issue and fails to acknowledge the obvious inferences to be drawn from the plain language of the press release and Plaintiff's termination the next day. *See Mejia v. Telemundo Mid-Atlantic LLC*, 440 F. Supp. 3d 495, 499 (D. Md. 2020) ("To determine whether a publication is defamatory, a question of law for the court, the publication must be read as a whole.") (quoting *Piscatelli*, 35 A.3d at 1147). Similarly, Defendants' argument that the statement "does not identify any individual by name," is unpersuasive given that Plaintiff was identified in the statement, albeit by title, rather than by name. ECF 11-1, at 14. The relevant test, as Defendants points out, is whether the defamatory words "refer to some ascertained or ascertainable person." *Publish America, LLP*, 84 A.3d at 247. The Court finds that Plaintiff plausibly alleges that the statements refer to him. *See Great Atl. & Pac. Tea Co.*, 261 A.2d at 736. And further, the statement, especially when coupled with the announcement of Plaintiff's termination the very next day, implies that Plaintiff failed to comply with Title IX obligations, and thus exposes Plaintiff to "public scorn, hatred, contempt or ridicule,

thereby discouraging others in the community from having a good opinion of, or from associating or dealing with, [him]." *Batson*, 602 A.2d at 1210.

In short, Plaintiff alleges that "[t]he clear implication of [] Sheares Ashby's and UMBC's statement was that [he] was being held accountable for UMBC's past failures to comply their Title IX obligations, despite the fact that [Plaintiff] had been the individual who reported Cradock's abuse and suspended him." ECF 5, at 13 ¶ 34. Plaintiff also alleges that he "told Sheares Ashby and UMBC that these representations were false, and though they acknowledged he was correct, UMBC and Sheares Ashby rejected [his] request for UMBC to issue a public statement exonerating [him] or separating him from the DOJ Report findings," *id.* ¶ 35, and as a result, Plaintiff is "unemployed, effectively unhirable and his reputation, job prospects, and future opportunities have been forever impaired and tarnished," *id.* at 14 ¶ 38.[7] Accordingly, Plaintiff has plausibly alleged the requisite elements of a libel and libel-by-implication claim. *See Piscatelli*, 35 A.3d at 1147 (explaining that to state a claim for defamation, plaintiff must allege that 1) the defendant made a defamatory statement to a third person, 2) that the statement was false, 3) that the defendant was legally at fault in making the statement, and 4) that the plaintiff thereby suffered harm).

2.    Immunity from State Law Tort Claims

Defendants argue that "University employees are entitled to immunity from state law tort claims pursuant to Section 5-522(b) of the Courts and Judicial Procedures Article" because

---

[7] The Court notes that "[o]n a motion to dismiss a libel suit because of no actionable statement, the court must of course credit the plaintiff's allegation of the factual falsity of a statement." *Chapin*, 993 F.2d at 1092 (citation omitted). Thus, the Court assumes for the purposes of the Motion that Plaintiff complied with Title IX obligations and reported and suspended Cradock upon learning of the allegations of misconduct against Cradock, and thus the statement implying that he did not comply with Title IX obligations was false.

Plaintiff "does not assert any factual allegations that, if proven, would show that President Sheares Ashby acted with malice or gross negligence when she issued the statement." ECF 11-1, at 15. Plaintiff contends that "Defendant [Sheares] Ashby had actual knowledge that [Plaintiff] was not one of 'those identified [by the DOJ report] as having failed to comply with their Title IX obligations' when she published the March 18th statement implicating [Plaintiff] as having failed to comply with Title IX obligations related to Cradock's abuse and UMBC's coverup," ECF 14, at 33 (citing ECF 5, at 12–13 ¶¶ 31, 33, 35), and therefore "[Sheares] Ashby made the statement with knowledge of its falsity or a reckless disregard for its truth," *id.* (citation omitted).

"State personnel . . . are immune from suit in courts of the State and from liability in tort for a tortious act or omission that is within the scope of the public duties of the State personnel and is made without malice or gross negligence . . ." Md. Code Ann., Cts. & Jud. Proc. § 5-522(b). "To establish malice, a plaintiff must show that the government official 'intentionally performed an act without legal justification or excuse, but with an evil or rancorous motive influenced by hate, the purpose being to deliberately and willfully injure the plaintiff.'" *Nero v. Mosby*, 890 F.3d 106, 127 (4th Cir. 2018) (quoting *Bord v. Baltimore Cnty.*, 104 A.3d 948, 964 (Md. App. 2014)). "A government official commits gross negligence 'only when he or she inflicts injury intentionally or is so utterly indifferent to the rights of others that he or she acts as if such rights did not exist.'" *Id.* at 128 (quoting *Cooper v. Rodriguez*, 118 A.3d 829, 846 (Md. 2015)).

Critically, Plaintiff alleges that on the day following the issuance of the press release, Sheares Ashby agreed that the press release was false insofar as it implied Plaintiff had acted improperly in handling the allegations against Cradock.[8] ECF 5, at 13 ¶ 35. It is highly unlikely

---

[8] Specifically, Plaintiff alleges that he approached President Sheares Ashby and told her that "the[] representations [in the press release] were false," and that she "acknowledged he was correct," but

that Sheares Ashby believed the statements to be true on the day they were uttered but somehow came to agree, just one day later, that they were false. As such, Plaintiff has plausibly alleged that Sheares Ashby issued the statements with knowledge of their falsity and with a purpose of deliberately injuring Plaintiff. *See New York Times Co. v. Sullivan*, 376 U.S. 254, 280 (1964) (defining actual malice in a defamation case as a statement made "with knowledge that it was false or with reckless disregard of whether it was false or not"). Therefore, the Court declines to hold that Sheares Ashby is entitled to immunity because the Complaint alleges facts that, if proven, show that she acted with malice or gross negligence in issuing the statements. *See Barbre v. Pope*, 935 A.2d 699, 714 (Md. 2007) ("[S]tate personnel are not immune from suit and liability in tort when the plaintiff's complaint sufficiently alleges malice or gross negligence.").

## IV.    CONCLUSION

For the foregoing reasons, Defendants' Motion is **GRANTED in part** and **DENIED in part**.

A separate implementing Order will issue.

Dated: <u>April 29, 2025</u>                                          <u>        /s/        </u>
                                                                Brendan A. Hurson
                                                                United States District Judge

---

"rejected [Plaintiff's] request for UMBC to issue a public statement exonerating [Plaintiff] . . . from the DOJ Report findings." ECF 5, at 13 ¶ 35.